THE RAYMOND-HADLEY CORPORATION, Respondent, Appellant,
*v.* BOSTON AND MAINE RAILROAD and JAMES H. HUSTIS,
as Receiver of BOSTON AND MAINE RAILROAD, Appellants,
Respondents.

First Department, February 7, 1919.

Carrier — interstate commerce — storage charges — schedules filed
by carrier controlling — construction of schedules — unauthorized
storage of goods by carrier — failure to receive goods upon wharf
as required by contract.

Under the provisions of the Interstate Commerce Act, as amended, a
carrier is prohibited from making any storage charge, or charge for any
service connected with the transportation and delivery of freight, other
than those authorized by the tariff schedule filed, and, as a carrier pre-
pares its own schedules, it is not entitled to have them liberally
construed in its favor, and the rule of fair and reasonable construction
applies.

Where the tariff schedule filed by a carrier engaged in interstate commerce
and in the loading of goods for transportation to foreign countries pro-
vided for a certain period of free storage on a certain wharf, but the
shipper was unable, owing to the requisitioning of ships by the govern-
ment during the war, to procure a vessel to carry the goods, the carrier
is not entitled to charge the shipper for removing the goods from the
wharf, storing them in a warehouse and for reloading them upon the wharf,
where its tariff schedule made no provision for such an emergency. The
carrier was only entitled to charge for storage as if the goods had remained
upon the wharf which, under the bill of lading, was to be " a reasonable
charge for storage " after the period of free storage had expired.

Where the carrier agreed to receive the goods at a specified wharf and
there to load them into ships procured by the plaintiff for shipment to
a foreign country, it cannot hold the shipper for storage charges where
it did not receive the goods upon said wharf but retained them in cars
at other points until such time as the shipper was able to procure a
vessel for transportation.

APPEAL by the defendants, Boston and Maine Railroad
and another, from a judgment of the Supreme Court in favor
of the plaintiff, entered in the office of the clerk of the county
of New York on the 9th day of May, 1918, upon the decision
of the court after a trial before the court, a jury having been
waived.

Appeal by the plaintiff, The Raymond-Hadley Corporation, from so much of said judgment as disallows part of its claim.

*Neil P. Cullom* of counsel [*Cullom & Rinke,* attorneys], for the plaintiff.

*H. E. J. MacDermott* of counsel [*Oeland & Kuhn,* attorneys], for the defendants.

Laughlin, J.:

The plaintiff was engaged in buying flour in carload lots at the mills and shipping it to the seaboard and it shipped 109 carloads of flour from western points in the United States and Canada over the defendant's line on local bills of lading consigned to Mystic Wharf, Boston, Mass., with a notation thereon " for export under terms of the Order in Council No. 1950-B, September 20, 1915." The cars all arrived at the port of Boston between December 17, 1915, and February 9, 1916, and were subsequently unloaded at Mystic Wharf and loaded into steamships for transportation across the sea. The defendant assessed against and collected of plaintiff $4,965.31 for storage charges on the flour. The plaintiff paid the charges under protest and brought this action to recover the same on the ground that they were not authorized by the tariff schedules of the defendant in force at the times in question. The bills of lading contained a provision for " a reasonable charge for storage " in the cars or at a warehouse after the expiration of two days' notice of arrival, exclusive of legal holidays. This was all interstate commerce, however, and by virtue of the provisions of section 1 and section 6, paragraphs 1 and 7, of the Interstate Commerce Act of February 4, 1887, as amended, the carrier was prohibited from making any storage charge, or charge for any service connected with the transportation and delivery of freight other than those authorized by the tariff schedule filed. (See 24 U. S. Stat. at Large, 379, § 1, as amd. by 36 id. 544–546, § 7; 24 id. 380, § 6, as amd. by 34 id. 586, 587, § 2; *Pennsylvania R. R. Co.* v. *Titus,* 216 N. Y. 17; *Texas & Pacific Railway* v. *Mugg,* 202 U. S. 242.) Since the carrier prepared the tariff schedules it is not entitled to

have them liberally construed in its favor and the rule of fair and reasonable construction applies. (*Wilson* v. *L. I. R. R. Co.*, 178 App. Div. 799; *Staten Island R. T. R. Co.* v. *Marshall*, 136 id. 571. See, also, *Swift & Co.* v. *Hocking Valley R. Co.*, 243 U. S. 281.) By the tariff schedule of the defendant in force at the times in question, for part of the period free storage for thirty days was allowed on export freight on Mystic Wharf, and later this period was reduced to fifteen days, and after the lapse of the free period a storage charge on tonnage basis was prescribed. Forty-two of the cars were unloaded at Mystic Wharf on arrival. It was stipulated to be the duty of the carrier to unload the cars and place the contents thereof at vessel's side and that it was the duty of the plaintiff to procure ships. It was also stipulated that Mystic Wharf was a pier for the reception of freight of every character, and was not exclusively used for flour and that owing to the requisitioning of ships by our government and by the Allies there was a shortage of bottoms for ocean traffic and abnormal conditions existed resulting in the congestion of freight of various kinds and for various shippers on Mystic Wharf and it was impossible for the plaintiff to place contracts for the shipment of the flour at the time of its arrival and it was unable to obtain ships for transportation of any of the flour until on or about April 4, 1916. After the forty-two carloads of flour had been on the wharf until after the expiration of the periods for free storage, the defendant demanded that plaintiff furnish a vessel for the shipment thereof, and it being unable so to do, the defendant in order to enable it to conduct its business with other shippers and having no warehouse of its own at Boston, removed the freight to a public warehouse and brought it back to the wharf in time for shipment by the first vessel that the plaintiff was able to secure. The storage charges on the forty-two carloads of flour in accordance with the tariff schedules up to the time the flour was so removed to the warehouse were $535.29. That charge the plaintiff concedes to be correct. The defendant, however, made further charges aggregating $3,142.16, consisting of charges for the removal to and return from the warehouse, the charge of the warehouse for storage and for reloading the flour for the

return shipment. If the flour had not thus been removed from the wharf the further storage charges on the wharf pursuant to the tariff schedules would have amounted to $599.44. The trial court held that the defendant was neither entitled to charge the plaintiff the amount it did charge for the removal of the flour and storage in a warehouse and return thereof nor for any amount for that period, on the ground that no charge was authorized under the tariff schedule. The tariff schedule contains no provision limiting the period during which the storage charges at the rates therein specified shall continue to run or within which it shall be the duty of the consignee to remove the goods. While, therefore, the convenience of the carrier in transacting its general business warranted it in removing the goods from the wharf on the plaintiff's failure to provide for the shipment thereof, it is quite clear, I think, that by its tariff schedule it failed to make provision for such an emergency, and that it, therefore, was not entitled to charge the plaintiff with the expenses of removing and storing the goods elsewhere; but it seems to me that it should be entitled to charge storage for that period in accordance with its tariff schedules as if the goods had remained on the wharf. It was stipulated, however, that both the bill of lading and the tariff schedule contained provisions for the right of inspection of the flour before shipment and it was further stipulated that this was necessary and that such inspection is customarily made while the flour is on the wharf. It is, however, further expressly stipulated that the plaintiff makes no claim that it was precluded from making a proper inspection of the flour. It is to be inferred that such inspection was made either before the goods were removed to the warehouse or subsequent to their return and before shipment. In the circumstances, therefore, I am of opinion that it was immaterial to the plaintiff where the flour was stored since the liability of the defendant as a warehouseman continued. The defendant was entitled in my opinion to charge storage for this period precisely the same as if the flour had remained on the wharf.

It was stipulated that the other sixty-seven cars were held by the defendant on holding tracks in the port of Boston but not on Mystic Wharf until March twenty-second, and

that between that date and April 4, 1916, the plaintiff having obtained shipment, they were taken to the wharf and unloaded and on the fourth of April placed on board steamship for transportation. None of this flour was on the wharf more than fifteen days and, therefore, no storage accrued *after* the cars were unloaded.

The court found that Boston, Hoosac Wharves and Mystic Wharf are three separate and distinct points of destination and that Mystic Wharf was the point of destination of all of this flour, and no exception was taken thereto and no complaint thereof is made. It was stipulated that prompt notice of the arrival of all of the cars was given by the defendant to the plaintiff. One of the notices was introduced in evidence and it bears date "Boston, Dec. 8, 1915," and is in the name of the defendant's general agent and stated that the car arrived on December sixth and seventh, and that "Storage & per diem charges or free time, if any, will be figured from this date." The notice does not otherwise state where the car had arrived. It does not appear that any of these cars came to the wharf until about the time they were unloaded and it is fairly to be inferred that they did not, for it was stipulated generally that the cars were held on holding tracks in the port of Boston, but not on Mystic Wharf, nor does it appear how far the port of Boston was from Mystic Wharf. It was also stipulated that on the 3d and 6th of January, 1916, the defendant notified the plaintiff that it could not unload any more flour until the arrival of a steamer. On or prior to January third, thirty-three of the other forty-two cars had arrived and been unloaded onto the wharf and the flour still remained on the wharf, and on or before that date thirty-one of these sixty-seven cars had arrived at Boston. The defendant charged storage charges on the flour in the sixty-seven cars on the basis of its tariff schedules as if the flour had been unloaded at the wharf at the time it arrived. These charges aggregate $1,823.21.

The plaintiff claims to be entitled to recover the amount of these charges, and interest. Its claim was disallowed by the trial court. It is contended by counsel for the plaintiff that this charge was made while the cars were in transit and before they had reached their destination and that it is a

charge for the storage of the goods while in the cars, and is, in effect, a demurrage charge, which it is claimed differs materially from a storage charge. The provisions with respect to demurrage charges, if any, in the defendant's tariff schedule are not in the record, but it was stipulated that the tariff of rules and regulations filed by the defendant provided for a period of free storage at Mystic Wharf " and a certain reasonable charge for storage space occupied on the wharf after that time." It having been stipulated that the only theory on which this charge can be justified is that it is a charge for storage under the tariff schedule, and that the storage charge is for storage space occupied *on the wharf* after the expiration of the period for free storage, and this freight not having been delivered to the wharf until about the time it was to be shipped — it seems quite clear that the charge cannot be justified as a storage charge. I am, therefore, of opinion that the plaintiff is entitled to recover this item exacted for storage charges.

It follows that the findings and conclusions of law inconsistent with these views should be reversed and appropriate findings and conclusions of law made in accordance therewith, and the judgment modified by deducting therefrom the sum of $599.44, with interest from the 29th day of April, 1916, and by increasing it by the sum of $1,823.21, with interest thereon from the same time, and as thus modified affirmed, with costs to plaintiff, appellant.

CLARKE, P. J., DOWLING, SMITH and MERRELL, JJ., concurred.

Judgment modified as stated in opinion and as modified affirmed, with costs to plaintiff, appellant. Order to be settled on notice.